[Civ. No. 36214. First Dist., Div. Two. Mar. 4, 1976.]

JAMES G. FREEMAN & ASSOCIATES, INC.,
Plaintiff and Respondent, v.
BEVERLY F. TANNER, Defendant and Appellant.

2

[redacted]

COUNSEL

Lucille F. Athearn for Defendant and Appellant.

Patmont & Myers and F. Bradford Niebling for Plaintiff and Respondent.

OPINION

TAYLOR, P. J.—On this appeal[1] by Tanner from a judgment in favor of Freeman, her former broker, the major question is whether the trial court properly concluded that under the oral contract of the parties Tanner was obligated to repay unearned advanced commissions after the termination of the contract. For the reasons set forth below, we have concluded that the judgment in favor of Freeman must be affirmed.

---

[1]The record indicates that after Tanner filed a timely notice of appeal, she designated only a partial reporter's transcript, but failed to state the points to be raised. As California Rules of Court, rule 4(b) requires the appellant to set forth the points to be raised on an appeal on a partial transcript, Freeman successfully moved to dismiss the appeal in No. 35985 (Division Four, Nov. 29, 1974). Tanner's petition for a rehearing on the order of dismissal was granted on December 27, 1974, after she set forth good cause for relief and properly set forth the points to be raised. We may properly take judicial notice of these proceedings and the record in No. 35985, so far as pertinent to the instant appeal (Evid. Code, § 450; *Mason v. Drug, Inc.*, 31 Cal.App.2d 697 [88 P.2d 929]).

Viewing the record most strongly in favor of the judgment, the following pertinent facts, adapted from Freeman's brief, appear: Tanner was a sales representative for Freeman between April 1970 and her voluntary termination as of February 24, 1972. During this time, she engaged primarily in the sale to teachers of tax-sheltered annuities, a form of insurance that allows teachers to defer income and the tax liability on such income until death, disability or retirement.

Customarily, the sales representative places a tax-sheltered annuity policy with a teacher by having the teacher execute two documents. The first is an authorization to the teacher's employer to deduct from his salary a specified monthly contribution (i.e., the premium) and to pay this sum to the designated insurance carrier; the second is an application to a particular insurance carrier for a tax-sheltered annuity policy. Pursuant to contracts between Freeman and the various carriers whose products it sold and upon receipt of the application, the particular carrier advanced to Freeman a commission based on the premiums which the carrier was to receive during the first year in which the policy was in effect. From this advanced commission, Freeman advanced a portion to the sales representative, who had placed the policy.

According to the contracts between Freeman and the various carriers, a first-year commission was deemed fully earned only if the particular teacher made all of the monthly contributions required during a specified period of time following commencement of the policy, a period known as the "chargeback period." For all carriers except California Western States Insurance Company (Cal Western), the chargeback period was one year; for Cal Western, the chargeback period was two years.

If a teacher allowed the policy to lapse[2] during the applicable chargeback period, or if the policy contributions never commenced or the policy was not taken in the first place, the first-year commission was not fully earned. Accordingly, Freeman's contracts with the various carriers provided that the effect of a lapse or a not taken was to require Freeman to repay to the applicable carrier a portion or all of the first-year commission on the policy which had lapsed or had not been taken. In the case of all carriers except Cal Western, Freeman was

---

[2] A lapse is the cessation of contributions by the teacher during the applicable chargeback period and occurs when the teacher ceases contributions, whether or not he withdraws all contributions made to date; a lapse also occurs as to the amount of any decrease in the contributions made by the teacher.

obliged to repay a proportionate part of the first-year commission to the carrier, depending upon the length of time during which contributions had been made; in the case of Cal Western, Freeman repaid the entire first-year commission and was then paid by Cal Western a flat monthly rate or single premium for the number of months during which contributions had been made. These charges against Freeman by the carriers were known as chargebacks.

As Freeman was charged back by the carriers on first-year commissions, it charged back to the sales representative who had placed the policy a proportionate part of the advanced commissions received. These were also known as chargebacks and were commonly made as deductions from other commissions due the sales representative.

After a policy had been in effect for one year, the carrier paid Freeman an annual renewal commission or service fee for the next nine years so long as contributions continued to be paid. During Tanner's tenure as a sales representative, Freeman paid a proportionate part of the renewal commission to its sales representatives so long as they continued to represent Freeman. If a sales representative terminated, the sales representative who took over the account would receive the proportionate part of the renewal commission.

During Tanner's first year as a sales representative, she had no written agreement concerning her services. In early 1971, she and one or two other sales representatives suggested to Freeman's president and sole stockholder that their relationships be put in writing. In response to these suggestions, James G. Freeman drafted a sales representative contract and submitted it to every sales representative. All sales representatives signed the contract in its original form except Tanner and Marvin Kahan. On June 30, 1971, James G. Freeman met with Tanner and Kahan to discuss their objections to his draft. In response to their objections, Freeman deleted paragraph 9, and both Tanner and Kahan signed their copies of the document. The pertinent portions of the three-page document signed by Tanner are set forth below.[3]

---

[3] "1. Each Service Representative is a self-employed, self contracting person, and nothing in this contract should be construed as to suggest employer-employee relationship.

"2. All commission advances will be charged back to the Service Representative in the event of 'lapse or not-taken', as such advances are charged back to the Corporation by the Carriers concerned.

"3. This agreement extends to all business written from the date the Service

In August 1971, Freeman drafted and sent to all sales representatives an amendment to their sales representative contracts. This amendment deleted the original paragraph 9[4] and substituted a new paragraph 9.[5] In the cover letter that accompanied the amendment the sales representative was requested to sign and return a copy of the amendment. Tanner received this amendment but neither signed nor returned it to Freeman. She continued to work for Freeman until January 24, 1972, when she and Kahan gave Freeman identical 30-day notices of termination of their sales representative contracts and went into business together. From June 30, 1971, to January 24, 1972, Tanner wrote a significant amount of tax-sheltered annuity business for Freeman, was paid therefor according to the terms of her contract and accepted chargebacks to her account.

On December 21, 1972, Freeman filed the instant action and, so far as here pertinent, alleged that Tanner had breached her sales representative contract by failing to repay certain unearned commissions and sought declaratory relief as to her obligation to repay unearned advance commissions after the termination of her sales representative contract.

Tanner's answer denied the material allegations of these causes of action and raised two affirmative defenses, namely, that: 1) the provision of the sales representative contract on which the complaint rested (par. 9) was expressly deleted therefrom; and 2) the contract was oppressive and contrary to public policy.

---

Representative originally began to represent the Corporation and its clients.

"8. This contract may be terminated by either party upon thirty days written notice.

"10. This contract may be amended at the will of the Corporation on thirty days written notice.

"11. Service fees become vested upon death or total disability.

"The Corporation will pay a seven percent (7%) first year commission on all paid business. The Corporation will provide a 1% of premium in force non-vested service fee on years two through ten. Service fees will be paid to the Service Representative only so long as he represents the Corporation."

[4]The original paragraph 9 deleted from the document signed by Tanner read as follows: "In the event of the termination of this agreement, the Service Representative agrees to maintain all written business in force for a minimum period of one (1) year *and to accept any first year charge-backs which may occur after such termination.*" (Italics supplied.)

[5]The revised paragraph 9 read as follows: "In the event of termination of this agreement, the Servic [sic] Representative *agrees to accept all charge backs on any business which results in a charge back to the Corporation.*" (Italics supplied.)

The trial court made the following pertinent findings:

On June 30, 1971, Freeman, through its president, James G. Freeman, and Tanner orally agreed that, in order to formalize the terms under which Tanner would act as a sales representative for Freeman, they would sign the document with original paragraph 9 deleted and that Mr. Freeman would redraft paragraph 9, which would be part of their agreement. Pursuant to the compensation arrangement established by the agreement, Freeman advanced Tanner a specified portion of the commission received by Freeman from the insurance carrier upon the placement of a policy by Tanner. Any such commission did not become fully earned until the passage of a certain period of time (denominated the chargeback period). If the policyholder ceased making premium payments or reduced his premium payments within the chargeback period (a lapse) or if he failed to commence making premium payments (not taken), Freeman was obliged to remit the unearned commission (the chargeback) to the carrier.

Pursuant to paragraph 2 of the agreement, the parties agreed that Tanner would repay Freeman the unearned portion of her advanced commission as Freeman was charged back by the carrier. The parties intended that paragraph 2 should apply to all chargebacks, regardless of whether they occurred prior or subsequent to the termination of the agreement.

Tanner received $17,142.23 from Freeman in advanced commissions on policies on which there was a chargeback but refused to repay the unearned portion of her advanced commission. Of this sum she earned $7,153.73; the remainder, or $9,988.50, she has not earned or repaid.

In reaching their agreement, the parties agreed that Tanner had the right to resell or "switch" her customers after termination, provided she repaid all unearned commissions to Freeman. A switch is the simultaneous or contemporaneous lapse of one policy and placement of the customer in a new policy. The parties did not intend that Tanner be liable to repay unearned commissions resulting from switches occasioned by Freeman's sales representatives. The sum of $335.70 of the $9,988.50 in unearned commissions resulted from switches by Freeman's sales representatives.

Freeman has not paid Tanner $228.21 in renewal fees, to which she was entitled under the agreement. This amount should be credited

against the unearned commissions owing by her, leaving a balance of $9,424.59. By means of her receipt and failure to repay unearned commissions, Tanner has benefited in the net amount of $9,424.59, which Freeman has had to repay to various insurance carriers.

The court concluded that: 1) the contract between the parties was not illusory; 2) after termination, Tanner was not relieved of her obligation to repay unearned commissions; and 3) Tanner had been unjustly enriched by the amount of $9,424.59 that she refused to repay, and entered its judgment accordingly.

As is readily apparent from our above summary of the record, ample substantial evidence supports the findings of the trial court. The only conflict in the evidence centered on whether at the meeting of June 30, 1971, Tanner and Kahan objected to both clauses of the deleted paragraph 9, or only the first part, permitting them to "switch" their customers, and whether they orally agreed that the provisions of the new paragraph 9 would be part of their oral agreement of employment. The trial court resolved the conflict in favor of Freeman. Kahan testified that for customers who were switched to new policies, the sales representative would receive a commission from the new carrier, thus providing ample basis for the trial court's finding that Tanner was unduly enriched at Freeman's expense by her retention of unearned commissions during the chargeback period when Freeman had to remit the unearned commissions to the carrier. As to customers who were not switched and retained by Freeman, the proportionate share of the renewal commission was paid to the new sales representative who serviced the clients for Freeman.

The issues raised by Tanner on this appeal pursuant to her second amended notice in No. 35985, of which we have taken judicial notice, were substantially stated as follows:[6] May a written contract be modified by an oral executory contract, contrary to the provisions of Civil Code section 1698? Should not ambiguities in a written contract be

---

[6]As is readily apparent, these issues are far narrower than those set forth and discussed in Tanner's briefs. As there is no indication that on reinstatement of the appeal the court permitted her to present additional errors, pursuant to California Rules of Court, rule 4(b), the appeal is necessarily limited to these issues. California Rules of Court, rule 4(b) provides, so far as here pertinent, that where the appeal is on a partial transcript and the appellant states the points to be raised on appeal, the appellant is precluded from presenting any grounds for reversal not embraced within the points stated by him, unless the reviewing court, on motion, shall permit the appellant to present additional errors or grounds of appeal on such terms as it may prescribe.

construed against the party who prepared it? Whether or not Freeman is estopped to claim that it could amend the original written contract at will and without Tanner's signature.[7]

 Contrary to Tanner's first contention, the trial court did not base its findings and conclusions on the modification of a written agreement by an oral executory contract. Rather, the court found that the parties made an oral agreement which consisted of the document signed and an agreement to redraft the deleted paragraph 9. The record also indicates that Tanner did not plead Civil Code section 1698 as an affirmative defense (*McDonald* v. *Filice,* 252 Cal.App.2d 613 [60 Cal.Rptr. 832]) and in any event, further waived the defense by failing to object to the introduction of evidence pertaining to the oral agreement. Parol evidence may be admitted to prove elements of an agreement not reduced to writing so long as the parties have not intended the writing to be a complete and final embodiment of their agreement and the parol evidence does not contradict the terms of the writing (*Birsner* v. *Bolles,* 20 Cal.App.3d 635, 637 [97 Cal.Rptr. 846]). That is precisely what occurred here as Freeman testified that the oral agreement of the parties consisted of the signed three-page document and the redraft of the second clause of paragraph 9 that he was to prepare.

 Tanner's contention concerning ambiguity ignores the fact that paragraph 2 of the agreement she signed clearly and unambiguously provides in the broadest possible language that: "All commission advances will be charged back to the Service Representative in the event of 'lapse or not-taken,' as such advances are charged back to the Corporation by the Carriers concerned." Thus, there was no conflict between the provisions of paragraph 2 and the redrafted version of paragraph 9. There was no evidence that either party intended paragraph 2 to apply only to the time prior to termination and the trial court properly found that the parties intended that paragraph 2 should apply to all chargebacks, regardless of when they occurred. At the time she signed the document, Tanner made no objections to the provisions of paragraph 2 and knew that the applicable chargeback periods were 12 or 24 months, depending on the carrier. As most of her clients were placed with Cal Western, she knew that her commission advances were subject to the 24-month period required by that company.

---

[7]As indicated in our above summary of the pleadings, neither Civil Code section 1698 nor estoppel were pled as affirmative defenses. The statute provides: "A contract in writing may be altered by a contract in writing, or by an executed oral agreement, and not otherwise."

The record also indicates that prior to signing, Tanner made no objections to paragraph 10, which permitted amendment at the will of the corporation on 30 days' written notice.

As to paragraph 10, we find particularly illuminating and helpful the following comment from the trial court's notice of its intended decision: "The contract was not illusory because each party was bound for at least the 30 days and even thereafter until the 30 days modification notice was given. Also, where the contract specifies performance the fact that one party reserves the power to vary it is not fatal if the exercise of the power is subject to prescribed or implied limitations such as the duty to exercise it in good faith and in accordance with fair dealings. See *Automatic Vending Co. vs. Wisdom* 182 Cal Ap 2d 354; *1 Witkin Summary of California Law* Pages 165-166. Certainly, an entity such as plaintiff would be impliedly bound to act in good faith and fairly with its sales representatives such as defendant herein."

We do not deem it necessary to discuss Tanner's remaining contentions concerning the purported ambiguities[8] and estoppel[9] as the trial court's findings and conclusions are so well based on paragraph 2 of the document signed by Tanner and the unjust enrichment[10] accruing to her. ██ In view of California Rules of Court, rule 4(b), it is not necessary for us to discuss the remaining contentions raised in Tanner's briefs.

The judgment is affirmed.

Kane, J., and Rouse, J., concurred.

---

[8] The record indicates that estoppel was not pled or made an issue at trial and therefore waived (*State Credit Corp.* v. *Ranger*, 101 Cal.App. 310 [281 P. 663]). The court found that Tanner's failure to sign the amended version of paragraph 9 was of no significance since its terms were included in the oral agreement of June 30, 1971.

[9] Tanner's contention based on an alleged ambiguity is based on an asserted conflict between paragraph 2 and the original and deleted version of paragraph 9. As indicated above, there was no conflict between paragraph 2 and paragraph 9, as amended. The fact that the amended version of paragraph 9 merely reiterated or emphasized the provisions of paragraph 2 is of no significance.

[10] Even assuming that the agreement was required to be in writing as it was not to be performed within one year (Civ. Code, § 1624, subd. 1), the statute of frauds cannot be applied to result in unjust enrichment (*Crail* v. *Blakely*, 8 Cal.3d 744, 752 [106 Cal.Rptr. 187, 505 P.2d 1027]).